S. H. HALEY, Respondent,

v.

William EDWARDS, Appellant.

No. 43994.

Supreme Court of Missouri.

Division No. 2.

March 14, 1955.

154

Gayles R. Pine, Warrensburg, for appellant.

John H. Mittendorf, Warrensburg, for respondent.

LYON ANDERSON, Special Judge.

This is a negligence action wherein plaintiff, S. H. Haley, sought to recover damages by Count I of the petition for injuries to his person, and in Count II thereof for damages to his automobile, which damages were alleged to have resulted from a collision between said automobile and a truck under the control of defendant. The trial resulted in a verdict and judgment in favor of plaintiff for $8,800. From said judgment, defendant has appealed.

The collision in question occurred on June 28, 1952, about 8:00 p. m. or a few minutes thereafter. The scene of the accident was on U. S. Highway 50 about one mile east of Knob Noster, Missouri. Earlier that evening plaintiff and a Mrs. Benson had been in Lamont, Missouri, and at the time of the accident were on their way home, traveling west on Highway 50 toward Knob Noster. They left Lamont about 7:30 p. m. It was dusk at the time. Plaintiff was driving a Plymouth sedan, and as he proceeded homeward drove at a speed of about forty miles per hour. Plain-

tiff had turned on the lights of his automobile when he left Lamont. It was Saturday night and there were many cars on the highway at the time traveling eastward from Kansas City. Plaintiff testified: "there was cars all the time. * * * They all had their lights on. There was just a blaze of fire down the road there." Plaintiff did not observe any cars proceeding westwardly in front of him just prior to the collision. Plaintiff's car was equipped with seal beam headlights and as he drove westwardly at the time in question the lights were adjusted to reflect downward. He testified when the lights were on the "down beam" they would "show up" on level ground, he imagined, about twenty-five or thirty feet.

One mile east of Knob Noster U. S. Highway 50 intersects with Highway "D." Beginning at the intersection, there is a down grade westwardly on Highway 50 for some distance, then a level stretch of road, beyond which is an ascending grade. The accident happened on the level stretch between the two hills, about 150 feet west of the intersection.

According to plaintiff's testimony, the defendant's truck at the time of the accident was unlighted and was parked facing west, partly on the north shoulder of the highway and partly in the north lane of the pavement. Plaintiff stated that it looked to him as though about one-half of the rear end of the truck was on the highway. U. S. Highway 50 at that point is a two lane highway, the concrete portion of which is eighteen feet wide. Plaintiff's car ran into the rear of the defendant's truck.

Plaintiff testified:

"Well, I was driving up there, just driving along and all at once I seen something and I hopped on my brakes and just about the time I got on the brakes I plowed into that truck. * * It didn't have no lights on it. * * * I think I was driving about 40 miles.

"Q. Did you have your lights on the up or down beam? A. Down beam at that time.

\* \* \* \* \* \*

"Q. When did you first see this vehicle ahead of you? A. Oh, I saw it just about the time I got on my brakes when I seen it, and I was right close to it.

"Q. That was when your lights first shown on it? A. Yes.

\* \* \* \* \* \*

"Q. How far were you away from it when you first saw it? A. I wasn't very far. I would guess 25 or 30 feet from it. * * * It looked to me like it was parked catawampus, the best I could say. The cab sort of on the shoulder and the back end on the highway * * *.

\* \* \* \* \* \*

"Q. Now just prior to the time of the collision, Mr. Haley, did you observe any vehicle approaching from the west, coming toward you? A. Yes. * * * all the way down there from Lamont there had been a solid stream of cars and they would bunch up, and there was quite a bunch passing right where the wreck was, just before I hit this truck.

"Q. Just prior to this accident and when you first saw the truck ahead, did you observe a car approaching you then? A. Yes, sir * * * I don't know just how far, not very far. * * * It was around eight o'clock I guess, somewhere. It might have been as late as 8:15.

\* \* \* \* \* \*

"Q. Did you turn your automobile to the right or left from the time you first saw this truck until the time you collided with it? A. I don't think I did, to tell you the truth about that. The fact is that if I had turned a little bit to the left over the black line I would have killed somebody else. I

couldn't get over it without hitting another car. I don't think I did, but I might have cut a little. * * * It seemed to me I hit the corner of it."

On cross-examination plaintiff stated that at the time he came by Highway "D" his visibility ahead was 25 or 30 feet, and that he saw defendant's truck when the "lights showed up on it."

The truck in question belonged to the defendant's father. It was a ton and a half Dodge truck with a Parkhurst combination grain bed and stock rack sixteen feet long. It had dual wheels. The truck was painted red, except for the end gate which was painted white. The rear end of the truck was 7' 10" wide.

On June 28, 1952, the day of the accident, defendant borrowed the truck from his father for use in harvesting his wheat. He had followed the combine with this truck and at the time of the accident was on his way to Knob Noster with wheat that had been combined that day. There were about 150 or 185 bushels of wheat in the truck at the time.

Plaintiff testified that the color of the truck was a dirty gray, and that he did not think it showed up well from the surrounding territory and the road.

Defendant testified that when he left Lamont he turned on the lights of his truck. There were four red lights on the rear of the truck bed (one at each corner), and a brake light underneath the bed of the truck.

Defendant's purpose in stopping his truck was to examine a highway sign he had just passed which was located at the intersection of Highway 50 and Highway "D." At the time he was not sure whether Knob Noster was on Highway 50. He testified that he stopped the truck partly on the shoulder with about two feet of the truck overhanging the pavement. He stopped about 70 steps west of the highway sign. He stated that the shoulder at that point was about six feet wide. He testified that he did not turn off the lights of the truck before going back to look at the highway sign. He stated that the tail lights were lit at the time; that when he returned to the truck after the accident the lights were still lit except for the tail light on the left rear which was put out as a result of the collision; that at the suggestion of someone there he turned off all lights on the truck. Shortly after leaving the truck, and while at the highway sign, he heard a crash, and upon looking back saw his truck moving toward the ditch on the right-hand side of the highway. It was light enough then for him to see both vehicles. The truck came to a stop in the ditch on the north side of the highway, about 45 feet from the point of impact. He stated that the Plymouth at the time was in the north lane headed west. He heard no screeching of brakes or sliding of tires before the crash. The point of impact on the truck, according to defendant's testimony, was about one foot from the left-hand corner. Defendant denied he ever made a statement that the lights on the truck were not turned on at the time of the collision. Defendant further testified that there was no traffic coming from the west at the time, and nothing to prevent plaintiff from turning to his left and going around the truck. However, on cross-examination, he testified he was not paying any attention to vehicles being driven along there at the time; that he did not even notice plaintiff's car when it passed him.

Deputy Sheriff Kenneth Sturgis testified that he arrived at the scene of the collision about 8:30 p. m. and found the truck turned over in a ditch on the north side of the road. He stated that there were tire marks made by the truck leading from the yellow line in the north side of the highway to the edge of the pavement. He further testified that he and Trooper Abney took the defendant to his home in Hughesville, Missouri, that evening, and that defendant told him he left the truck parked "half way on the pavement and halfway on the shoulder and he didn't have his lights on." Sturgis stated that the dirt shoulder of the highway where the collision occurred was five or six feet wide.

Sheriff Alex Nichols testified that he arrived at the scene of the accident about 8:15 p. m. and observed the truck, parked partly on the highway and partly on the north shoulder, headed in a northwestardly direction. Plaintiff's car was behind the truck and within the north lane of the highway. It had proceeded four or five feet from the point of impact and its front end was badly damaged. There were no front lights on the Plymouth, but the tail lights and dash lights were lighted. There were skid marks four or five feet in length made by the Plymouth, and leading in the direction of the truck were skid marks which began a little south of the yellow line. He further testified that the defendant told him that the truck had been left without lights with the back end on the north half of the north lane. He stated that the dirt shoulder on the north side of the pavement at the scene of the accident was eight or nine feet in width, and as much as ten or twelve feet wide a few rods to the east.

Homer Wilson testified that he arrived at the scene of the accident between 8:00 and 9:00 o'clock that evening. He stated that plaintiff's car was about 70 or 80 yards west of the intersection of U. S. Highway 50 and Highway "D", in the north lane, facing west. He observed tire marks on the north side of the slab, starting at the yellow line and leading off the slab in the direction of the truck. The tail lights were lighted on the plaintiff's car. There were no lights on the truck. Asked what defendant told him when he questioned him as to what happened, the witness replied: "This might not be word for word, but it is awful close; he wanted to know where Knobnoster was, and he stopped his truck and was going back to read or see if he was lost. * * * He said his battery and starter was bad, and that was the reason he didn't keep his lights on when we asked him why he didn't have his lights on." Wilson further testified that the north shoulder of the highway was seven or eight feet wide.

Julius Tacke, defendant's witness, testified that he came upon the scene of the accident about dusk. The plaintiff's car straddled the black line in the center of the highway, and the truck was in the ditch. Plaintiff's car was four or five hundred feet west of the Highway "D" intersection. He testified that he first saw plaintiff's car and the truck when he drove over the hill from the east. There were tire marks of the wheels of the truck along the edge of the pavement which directly led off into the ditch, and tire marks along the edge of the shoulder made by the right wheels. From the tire marks on the pavement it looked like the back end of the truck had slid toward the south six or seven inches. The skid marks on the pavement made by the dual wheels of the truck were behind the Plymouth. The shoulder was five or six feet wide. He did not see any tire mark to the rear of the Plymouth. He stated that as far as he could remember, there were tail lights on the truck, but was not positive about it. The skid marks of the truck were approximately one foot from the north edge of the pavement.

Luther Edwards, father of the defendant, testified that the truck was in good mechanical condition; lights in good working order; and the battery in good shape. He stated he saw the truck the next morning after the accident and observed that about one foot of the extreme left end of the bed was damaged.

W. E. Zink testified that he measured the width of the shoulder of the highway at the place in question and found it to be six and one-half feet wide where the yellow line in the north traffic lane started, which, according to the evidence in the case, was approximately where the accident occurred.

Plaintiff was rendered unconscious as a result of the collision. He was taken from the scene of the accident to a hospital in Warrensburg, Missouri, where he was confined for a period of two weeks. He sustained a fracture of the right leg at the hip joint, a cut over the right eye, and injuries to the left shoulder. Since there is no issue of excessiveness on this appeal, further reference to the evidence touching plaintiff's injuries and his condition at the trial is unnecessary.

Homer Wilson testified that the reasonable market value of plaintiff's automobile before the collision was from "around $810 to around $995," and that its reasonable market value in its damaged condition was from "$75 to $90, or $100."

Plaintiff submitted the case to the jury on instructions which predicated liability on the theory that defendant was negligent in failing to park his truck as near the right-hand side of the highway as practicable, and without displaying a red light on the rear of said truck.

Defendant submitted the issue of contributory negligence by instructions which authorized a verdict for defendant if the jury found that plaintiff failed to keep a vigilant watch for vehicles on said highway, and negligently failed to stop or swerve his said automobile upon the first appearance of danger.

The jury returned a verdict for plaintiff on count one in the sum of $8,000, and in favor of plaintiff on count two in the sum of $800.

Appellant's first point is that the trial court erred in failing and refusing to direct a verdict for the defendant. In support of this contention it is urged that plaintiff was guilty of contributory negligence as a matter of law in operating his automobile at 40 miles per hour at the time and place in question when he had a forward vision of only 25 or 30 feet. In making this contention appellant is asking this court to apply the so-called "assured clear distance rule." Under this doctrine it is the duty of the driver of an automobile to so regulate the speed of his car that he can at all times avoid an obstruction in the highway discernible within the radius of his headlights. Under the authorities applying said doctrine one's failure to perform said duty is negligence as a matter of law. See annotation in 44 A.L.R., p. 1403, where the cases on this subject are collated. Solomon v. Duncan, 194 Mo.App. 517, 185 S.W. 1141. This court, however, on several occasions has rejected the doctrine as establishing a hard and fast rule by which negligence should be determined.

Under our decisions a motorist is not necessarily guilty of contributory negligence as a matter of law solely because he drives at a speed which prevents his stopping within the range of his visibility. Other facts and circumstances may be present in the particular case which should also be taken into account from which a contrary inference might reasonably be drawn, and the issue determined upon a consideration of all the facts and circumstances in the case.

In deciding the matter, due regard should be given to such matters as the speed of the automobile, other traffic in the vicinity, the condition of the highway, the visibility of the atmosphere, the character of the obstruction, and all other facts and circumstances which might aid in determining the issue of due care. Thompson v. Byers Transportation Co., 362 Mo. 42, 239 S.W.2d 498; Johnson v. Lee Way Motor Freight, Inc., Mo.Sup., 261 S.W.2d 95.

The evidence shows that plaintiff was driving on an open highway, on the proper side of the road, at a speed of only 40 miles per hour, which in and of itself was not an unreasonable or dangerous rate of speed. He turned on the lights of his car when he left Lamont. It was dusk at the time. As he proceeded westwardly on Highway 50 he was constantly being met by cars traveling in the opposite direction, making it necessary for him to "dim" the lights on his car. When he reached the intersection of Highway 50 with Highway "D" plaintiff estimated that his visibility ahead was 25 or 30 feet. The intersection in question was at the top of a hill, which fact, together with the fact that the headlights on his car were adjusted to reflect downward, probably explains the shortness of his visibility ahead at that point. After passing the intersection plaintiff proceeded downgrade for some distance. At the bottom of the hill, on a level stretch of road, one hundred and fifty feet from the intersection, defendant's truck was parked partly on the highway without

lights. Beyond the parked truck was an ascending grade. Although the body of the truck was painted red, except for the end gate which was white, the whole truck was covered with dust, and at the time, according to plaintiff's testimony, was a "dirty grey" in color, which made it difficult to see against the dark background of the hill beyond and the concrete pavement.

Plaintiff had no reason to anticipate the presence of the truck at the place in question. Just prior to the collision plaintiff was met by a car traveling eastwardly. His vision ahead must have been affected by the lights of this car and the attention necessarily directed toward it in passing. It was also limited by reason of the topography of the highway at that place. Immediately upon seeing defendant's truck plaintiff applied his brake—the only thing that was possible for him to do. He could not swerve to the right for the reason that the truck occupied all of the shoulder on the right side of the highway. He could not swerve to the left because of on-coming traffic.

■ We think, under the evidence, there was an issue of fact presented as to whether plaintiff was driving at an excessive rate of speed under the circumstances, and hence guilty of contributory negligence. We are also of the view that we cannot declare as a matter of law that plaintiff was guilty of contributory negligence in failing to swerve.

It is next urged that plaintiff was guilty of contributory negligence as a matter of law for the reason that he operated his automobile without sufficient lights and in violation of Section 304.350 RSMo 1949, V.A.M.S. Said section provides that: "All road lighting beams shall be so aimed and of sufficient intensity to reveal a person or vehicle at a distance of at least one hundred feet ahead."

It is stated in defendant's brief that: "Plaintiff's testimony shows conclusively that he was operating his automobile in violation of the statute when the intensity of his headlights could not reveal the

Dodge truck at a distance of more than 25 or 30 feet." Plaintiff did not so testify. He stated that when the lights of his car were on the "down beam" they would "show up" on level ground, he imagined, about 25 or 30 feet, but he did not say how far the light would be reflected from the pavement through the atmosphere. He further testified that he first saw the truck when his lights first shone upon it, and when he was about 25 or 30 feet from it.

■ The fact that plaintiff failed to see the truck until the beam from his headlights fell upon it does not show conclusively that the lights in question did not comply with the statute. Plaintiff's failure to see the truck sooner can be otherwise explained, as we have heretofore indicated in disposing of appellant's first point. The same can be said of plaintiff's testimony with reference to his limited visibility as he came through the intersection at the crest of the hill. We would not be justified in holding that under the evidence the court should have directed a verdict on the theory that the evidence shows a violation of the statute.

Before the trial began, and out of the hearing of the jury, plaintiff's counsel inquired of defendant's counsel if he represented the Farm Bureau Mutual Insurance Company which had its principal office in Jefferson City. In answer to this question counsel for defendant stated that said company was interested in the defense of the case. Thereafter, the following occurred:

"Mr. Mittendorf: I would like to ask you ladies and gentlemen if any of you have any stock or financial interest in the Farm Bureau Mutual Insurance Company, which I believe has its principal office in Missouri at Jefferson City, Missouri. Do any of you own any part or have any financial interest in that insurance company?

"I believe their local claim office is across the street on the north side of the square, the local county part of the farm bureau has its offices there.

"Are any of you ladies or gentlemen or any members of your family employed by the Farm Bureau Mutual Insurance Company of Missouri? Do any of you members of the jury panel have any members of your family, your daughters or anyone else, working in that office on the north side of the square here?

\*   \*   \*   \*   \*   \*

"Mr. Pine (outside of hearing of jury): Now at this time, if the Court please, the defendant moves the Court to discharge the panel for the reason counsel for the plaintiff has over-emphasized the question of insurance in this case. The questions that have been approved by this Court, in the past are if they are employed by the insurance company or have any stock in the company or have any member of the family working for the company, but all this reference to the office here in Warrensburg, Missouri, they·do not have a local claims office in Johnson County and the question of insurance has been completely over-emphasized by counsel for the plaintiff and cannot be erased from the minds of the jury and they are prejudiced in this case and I move that they be discharged.

"The Court: Motion refused."

Appellant contends that by telling the jury that the insurance company had an office in Warrensburg, and by repeating the questions concerning financial interest and family employment, plaintiff's counsel unduly emphasized the matter of insurance and was guilty of bad faith. Appellant asks that the judgment be reversed and the cause remanded for that reason.

■ We are not convinced that there was error in the trial court's ruling. In view of the admission made by counsel for defendant, it was proper to permit inquiry with reference to any possible financial interest·members of the panel might have in said company. It was also proper for plaintiff's counsel to ask the jury if they or any members of their family were employed by the company. The mere repetition of the questions would not necessarily show a bad faith attempt on the part of counsel to prejudice the jury. We take the same view with reference to the statement that the company had a local office in Warrensburg. Whether a mistrial should be declared under such circumstances rests largely within the discretion of the trial court. The court's ruling is to be interfered with·only in the event of abuse of that discretion. We find no such abuse here. Schraedel v. St. Louis Public Service Co., Mo.App., 248 S.W.2d 25.

The admission of the testimony of Homer Wilson as to the value of plaintiff's automobile prior to the accident is the subject of defendant's next assignment of error. The evidence shows that this witness owned and operated a wrecker and filling station. He also dealt in automobile parts and had been in that business about twenty-one years. He was called to the scene of the accident shortly after it occurred and hauled plaintiff's car to his place of business.

Appellant objected to the testimony on the ground that Wilson was not qualified to give an opinion as to the value of plaintiff's car before the accident because there was no showing that he was acquainted with the automobile or with its condition prior to the collision. Admittedly, he had never seen the car prior to the time he removed it from the scene of the accident, and he was not familiar with the condition of the motor. The trial court overruled the objection to the question calling for this testimony and, in response to said question, the witness stated that the value of the automobile before it was damaged was "any place from around $810 to around $995."

Appellant's argument is that because Wilson had not seen plaintiff's automobile before the accident his testimony was inadmissible. Such a rule of exclusion would be unreasonable. In the very nature of things, a plaintiff, just prior to an accident involving his automobile, would rarely be so fortunate as to have had his automobile inspected by one qualified to give opin-

ion evidence. The rule advocated by appellant would debar a plaintiff from proving his damage in most cases. The better rule would seem to be to permit such testimony from one deemed by the court to be generally qualified to give opinion evidence as to values, and leave it to the jury to determine the weight and credibility of such testimony.

■ Homer Wilson testified he was familiar with the value of automobiles in general. The testimony also shows that he saw plaintiff's automobile shortly after the collision. With this evidence before him, the trial judge properly exercised his discretion in permitting this witness to testify as to the value of the car both before and after the accident.

Appellant assigns as error the giving of Instruction No. 1, requested by plaintiff. The first complaint lodged against this instruction is that the description of defendant's vehicle as "an automobile truck" was not in accordance with the evidence and was therefore misleading and confusing.

■ In the evidence the truck was described as a ton and a half Dodge truck with a Parkhurst combination grain bed and stock rack. Appellant's complaint, in our judgment, is frivolous. The jury could not have been confused and mislead in any way by the vehicle involved in the accident being described as "an automobile truck." They must have understood that it was the vehicle mentioned in the evidence and the one involved in the accident.

■ It is further urged that the instruction was misleading and confusing because it required a finding of an admitted fact, towit, that defendant's truck had been driven westwardly on the highway. In our judgment there is no merit to this contention.

■ A further complaint is made that the instruction did not require the jury to find that defendant parked the truck on the pavement or as near the right-hand side of the highway as practicable. An examina-

tion of the instruction reveals that there is no merit to the point urged. There was a specific requirement that the jury find said fact.

It is next urged that, in submitting the charge of negligence in failing to display a red light on the rear of said truck, the instruction did not submit the negligence pleaded. Appellant's contention is based on the assumption that by said instruction plaintiff intended to submit the allegation charging negligence under Section 304.450 RSMo 1949, V.A.M.S. There was an allegation in the petition which did charge negligence under said section. However, it was also alleged in paragraph five of the petition that: "defendant carelessly and negligently caused, permitted and allowed a 1947 Dodge truck, driven by him to be stopped and parked on the slab and paved portion of said Highway 50 so as to barricade and block the said highway without having any lights or other warnings attached to said truck or posted nearby so as to warn the plaintiff of the presence of said truck on said U. S. Highway No. 50." At the trial, plaintiff introduced evidence that there was no red light displayed on the rear of said truck. Defendant's evidence was to the contrary. Instruction No. 1 predicated recovery on a finding that at the time in question "said truck was not displaying a red light mounted on the back of said truck."

■ In our judgment, said instruction properly presented an issue within the scope of the pleadings and the evidence.

■ The instruction, in submitting the issue of failure to display a red light on said truck, required a finding that when defendant parked said truck on the highway "it was more than one-half hour after sunset." Complaint is made that the issue should not have been submitted because there was no evidence adduced as to the time the sun set on June 28, 1952, the date of the accident. The time of the setting of the sun on any particular day is a matter of judicial notice. McGowan v. Wells, 324 Mo. 652, 24 S.W.2d 633; Sterr v.

Wells, Mo.App., 273 S.W. 1092; Dodge v. City of Kirkwood, Mo.App., 260 S.W. 1012. Proof is not required of facts judicially noticed by the court and jury. Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S.W.2d 323; 31 C.J.S., Evidence, § 13, p. 519. There is no merit to the complaint made.

We find no merit in appellant's contention that the instruction was erroneous because it did not require a finding that defendant failed to exercise the highest degree of care. The instruction hypothesized facts which, if true, established defendant's negligence as a matter of law. It was therefore unnecessary for the instruction to have in it a further requirement that the jury find the conduct of defendant, established by the facts, constituted negligence. The law draws the conclusion in such cases. Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914; Oglesby v. St. Louis-San Francisco R. Co., 318 Mo. 79, 1 S.W.2d 172; Thompson v. City of Lamar, 322 Mo. 514, 17 S.W. 2d 960; Christiansen v. St. Louis Public Service Co., 333 Mo. 408, 62 S.W.2d 828; Borgstede v. Waldbauer, 337 Mo. 1205, 88 S.W.2d 373.

Appellant next complains of the action of the trial court in giving and reading to the jury Instruction No. 2. The point is raised in appellant's "Points and Authorities" in the following manner: "The Court erred in giving Instruction 2 requested by plaintiff over the objections and exceptions of defendant, because said instruction was misleading to the jury and did not correctly state the law."

There is no attempt in said assignment to inform the court wherein the instruction was misleading or in what respect it did not correctly state the law. Our Rule 1.08(a) (3), 42 V.A.M.S., contemplates a particularization in the statement of points relied on, and with citation of authorities directed to the specific points to which they apply. Clearly, appellant has not complied with the rule in this instance and, for that reason, the assignment in question presents nothing for review. Scott v. Missouri-Pac. R. Co., 333 Mo. 374, 62 S.W.2d 834; Meierotto v. Thompson, 356 Mo. 32, 201 S.W.2d 161; Townsend v. Lawrence, Mo.App., 267 S.W.2d 489.

Appellant complains of the giving of plaintiff's Instruction No. 3. That instruction was upon the burden of proof on the issue of plaintiff's contributory negligence. The instruction, in part, charged the jury that on said issue "the burden of proof is upon the defendant, and it devolves upon the defendant to prove such contributory negligence of the plaintiff by the preponderance of the evidence *to the satisfaction of the jury.*" (Emphasis ours.) It is urged that the use of the words "to the satisfaction of the jury" renders the instruction erroneous.

Instructions of like nature have been criticized and condemned in a great many decisions of this court, but the question as to whether the giving of said instruction in the instant case was reversible error is not properly before us. It appears from the record that defendant's motion for new trial contained no assignment of error, either general or specific, with reference to Instruction No. 3. We are, therefore, precluded from considering the point raised. See Supreme Court Rule 3.23, 42 V.A.M.S. Polster v. O'Hanlon, Mo.App., 267 S.W.2d 381.

Finding no error in the record, the judgment is affirmed.

ELLISON, P. J., LEEDY, J., and DEW, Special Judge, concur.